# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Thomas G. Krochta
Vanderburgh County Public Defender
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

|  |  |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of M.B., Father, and K.B., Child, <br><br> M.B., <br><br> *Appellant-Respondent,* <br><br> v. <br><br> Indiana Department of Child Services, <br><br> *Appellee-Petitioner.* | September 9, 2016 <br><br> Court of Appeals Case No. 82A05-1601-JT-152 <br><br> Appeal from the Vanderburgh Superior Court <br><br> The Honorable Brett J. Niemeier, Judge <br><br> Trial Court Cause No. 82D04-1507-JT-1315 |

**Kirsch, Judge.**

[1]   M.B. ("Father") appeals the juvenile court's order terminating his parental rights to his child, K.B. ("Child"). He raises one issues that we restate as: whether sufficient evidence was presented to support the termination of Father's parental rights.

[2]   We affirm.

## Facts and Procedural History

[3]   Father and A.E. ("Mother")[1] are the biological parents of Child, who was born in November 2012. Indiana Department of Child Service ("DCS") initially became involved with Child on October 14, 2014, after it received a report that Mother was pulled over in a vehicle and arrested for possession of methamphetamine, and DCS removed Child from her care. At the time of Child's removal, Father was incarcerated in the Vanderburgh County Jail on charges of dealing in methamphetamine. *DCS Exs.* 1 and 2. The next day, Mother met with a DCS family case manager ("FCM") and admitted that she would test positive for methamphetamine if given a drug screen.

[4]   On October 20, 2014, DCS filed a petition alleging that Child was a child in need of services ("CHINS"). The following day, the juvenile court held an

---

[1] Mother's parental rights to Child were terminated approximately two months before Father's were terminated. Mother appealed that decision, and a panel of this court affirmed the termination by memorandum decision. *In re K.B.*, No. 82A01-1512-JT-2161 (Ind. Ct. App. July 5, 2016).

initial/detention hearing, and the juvenile court authorized Child's continued removal. Mother and Father stipulated to the following evidence:

> On or about October 15, 2014, [Child] resided in Vanderburgh County in the care and custody of [Mother]. Mother was arrested by law enforcement for possession of methamphetamine, marijuana, and paraphernalia. [Mother] stated that if she were drug tested she[] would be positive for methamphetamine. Father, [M.B.], is currently incarcerated on charges of dealing in methamphetamine. [Father] stated before he was incarcerated, in April, he was using methamphetamine weekly. [Child's] mother and father have failed to protect and supervise said child or to provide appropriate safe environment for said child placing said child in danger of physical or mental harm.

*DCS Ex.* 1 at 6-7. The juvenile court adjudicated Child to be a CHINS. With regard to Father, the juvenile court ordered, "While the father is incarcerated, he is ordered to complete any program that will help with parenting and father is also ordered to contact FCM if he is to be released." *Id.* at 8.

[5]     After a November 12, 2014, dispositional hearing, the juvenile court issued a dispositional decree and ordered Father to contact DCS "within 24 hours of being released from the Vanderburgh County Jail." *Id.* at 4. On February 17, 2015, Father posted bond and was released from incarceration. At an April 1, 2015 review hearing, the juvenile court found that Father "has not been in complete cooperation with DCS" and "has not enhanced his ability to fulfill his parental obligations." *Id.* at 9. On April 18, 2015, Father was arrested and incarcerated on charges of operating a vehicle after forfeiture of license for life.

[6] On July 22, 2015, DCS filed a petition to terminate both parents' parental rights to Child. DCS sought permission to place Child out of state, and after the Interstate Compact on the Placement of Children process was completed, the juvenile court ordered that Child be moved to Wisconsin and placed with Mother's cousins.

[7] The juvenile court conducted evidentiary hearings on the petition to terminate Father's parental rights on October 8 and November 12, 2015. DCS presented evidence that, as of the October termination hearing, Father's pending criminal charges included Class A felony dealing in methamphetamine, Class D felony possession of a controlled substance, Class A misdemeanor trespass, and Level 5 felony operating a vehicle after forfeiture for life. *DCS Exs*. 14-16. DCS also presented evidence that Father's criminal history included the following felony convictions: possession of precursors and dealing in controlled substances in 2001, four convictions for auto theft in 2001; two convictions for auto theft in 2004; possession of methamphetamine in 2010; and operating a vehicle as an habitual traffic violator in 2011. *DCS Exs*. 3, 5, 6, 11, 13. He also had the following misdemeanor convictions: illegal consumption of alcohol in 2003; public intoxication in 2005, conversion and trespass in 2005; false informing in 2006; driving while license suspended in 2010; possession of marijuana in 2010; and purchase of over three grams of pseudoephedrine in 2011. *DCS Exs*. 4, 7, 8, 9, 10, 11, 12.

[8] DCS called as a witness Marissa Curry ("Curry"), who was employed with Ireland Home Based Services ("Ireland"). She testified that Ireland received the

referral from DCS on February 27, 2015, to arrange and supervise visits between Father and Child, once per week for two hours. Curry stated that Father participated in the first two visits, which were in March, but he failed to show up for the third; she contacted Father, and he was at a doctor's appointment and had forgotten the visit. Curry contacted FCM Ellen Moore ("FCM Moore") to advise her of the missed visit. Father did not contact Curry to set up any more visits, and the referral was closed on July 24, 2015.

[9]     FCM Moore testified that Father was present at the CHINS dispositional hearing, and he was ordered to contact her when he was released. When asked at the termination hearing if he did so, she replied, "[n]ot directly," although she was made aware of his release by another FCM with whom Father was involved in another case. *Tr.* at 66. FCM Moore was aware that Father had missed his scheduled visitation in March 2015, and, in April, FCM Moore contacted Father about the missed visit and discussed rearranging the visits, "but before another visit could be set up he was re-arrested" on April 18. *Id.* at 67. FCM Moore noted that Father "had the opportunity to spend time with [Child] and to be a part of his life" but that Father "was not as active as he could've been." *Id.* at 68-69. FCM Moore observed that Father never asked for Child to be placed with him and that Father's desire was for Child to return to Mother's care when she was released from incarceration. FCM Moore opined that termination was in Child's best interests because he needed a permanent home, which Mother had not provided and "Father's not gonna be able to provide[.]" *Id.* at 69. She observed that Mother's cousins in Wisconsin "are

hoping to adopt [Child]" and "are able to meet [Child's] needs and are eager to do so." *Id*. at 69, 72. The Court Appointed Special Advocate, Deborah Gamache ("CASA Gamache"), also testified and recommended termination of Father's parental rights.

[10] Father testified that he had lived with Child, who was then almost three years old, for four months in 2012 and for four months in 2013. He recalled that, from February 17 to April 18, 2015, he had two or three supervised visits with Child. Father's proposed plan for care of Child was for Mother "to get another chance to get him back." *Id*. at 19. He desired that Child return to Mother when she was released from incarceration, which he anticipated to be in nine months. *Id*. at 38 ("I want [Mother] to get [Child] whenever she gets out.").[2] Father testified that, sometime prior to the November 12, 2015 termination hearing, he had pleaded guilty to "doing methamphetamine," but that sentencing had not yet occurred. *Id*. at 56, 59. He believed that the minimum amount of time that he would be required to serve would be twenty years. *Id*. at 57.

[11] On January 13, 2016, the juvenile court issued its order terminating the parent-child relationship between Father and Child. The juvenile court found, among other things:

---

[2] Father's testimony in this regard occurred on October 8, 2015; Mother's rights to Child were terminated on November 25, 2015.

5. On October 16, 2014, [Child] was in his Mother's care, when [she] was arrested for possession of Methamphetamine, possession of [paraphernalia], possession of marijuana and driving while license suspended.[3]

7. At the time [C]hild was taken into custody, [] [F]ather was incarcerated on pending charges. Father was facing charges for Dealing Methamphetamine and possession of a controlled substance.

12. The Dispositional hearing and decree was held on [F]ather on 10-21-14. Father remained in custody until February 17, 2015.

13. On or about February 17, 2015, a cash bond was posted in Father's pending criminal matter.

16. On or about March 4, 2015, [] Father visited with [Child]. This was Father's first time visiting with [Child] since the opening of the case.

17. Subsequently, on March 10, 2015, Father had a second visit with [Child].

18. On or about March 18, 2015, [F]ather missed a scheduled visit with [Child].

20. On or about April 08, 2015, FCM Moore reached out to [] Father to speak with him about his missed visits with [Child]. She informed [] [F]ather that he needed to show more

---

[3] DCS's Intake Officer's Report of Preliminary Inquiry and Investigation and its Predispositional Report indicate that Child was removed from Mother's care on October 14, 2014. *DCS Ex.* 2 at 4-5, 9, 15.

commitment to [Child], Father was instructed not to miss any more visits.

21. After Father's conversation with FCM Moore, Father never visited with [Child] again.

22. On or about April 22, 2015, [F]ather was rearrested for new criminal charges.

26. Father has not successfully completed any services to aid in his ability to care for [Child].

27. Father has no bond with his three year old son.

28. Father does not have a reasonable plan on how he would care for [Child]. Father testified that he could not care for [Child] and that he did not intend to get custody of [Child].

34. Father has entered into a Plea Agreement to Dealing Methamphetamine, a class A felony, in which he was going to serve at least 20 years in Prison.

*Appellant's App.* at 22-24. The juvenile court concluded that there was a reasonable probability that the conditions that resulted in Child's removal and placement outside the home would not be remedied, the continuation of the parent-child relationship posed a threat to the well-being of Child, it was in the best interest of Child to terminate the relationship, and a satisfactory plan for the care and treatment of Child existed. The juvenile court terminated Father's parental rights, and he now appeals.

# Discussion and Decision

[12]     As our Supreme Court has recently reiterated, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive—so we review them with great deference to the trial courts[.]" *In re E.M.*, 4 N.E.3d 636, 640 (Ind. 2014). While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child, and thus parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *Bester v. Lake Cnty. Office of Family & Children,* 839 N.E.2d 143, 145 (Ind. 2005); *In re T.F.,* 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied.* That is, parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 371 (Ind. Ct. App. 2007), *trans. denied.*

[13]     When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* at 148-49. A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *In re Involuntary*

*Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

[14] Here, in terminating Father's parental rights to Child, the juvenile court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* A finding is clearly erroneous only when the record contains no facts or inferences drawn therefrom that support it. *Id.* If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[15] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2)(B). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re H.L.*, 915 N.E.2d at 149. Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

[16] Father argues that DCS failed to prove the required elements for termination by sufficient evidence. Specifically, he contends that DCS failed to present sufficient evidence that the conditions that resulted in Child being removed or the reasons for his placement outside the home would not be remedied and that the continuation of the parent-child relationship posed a threat to Child's well-being.[4] He also contends that DCS failed to prove that termination was in Child's best interest.

---

[4] Father does not contend that DCS failed to prove that there was a satisfactory permanency plan in place for Child. Accordingly, he has waived any challenge to that element of the termination statute. Ind. Appellate Rule 46(A)(8).

*Remediation of Conditions*

[17]    In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what conditions led to the child's placement and retention in foster care, and, second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id*. In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d at 643 (quoting *K.T.K.,* 989 N.E.2d at 1231). Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *A.F. v. Marion Cnty. Office of Family & Children,* 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied.* In addition, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Involuntary Termination of Parent-Child Relationship of Kay L.,* 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *In re E.M.*, 4

N.E.3d at 643. Although trial courts are required to give due regard to changed conditions, this does not preclude them from finding that a parent's past behavior is the best predictor of their future behavior. *Id*.

[18] We note that, in claiming that the evidence was insufficient to support the juvenile court's order terminating his parental rights, Father does not challenge the sufficiency of the evidence to support any of the juvenile court's findings. As a result, Father has waived any argument relating to whether these unchallenged findings are clearly erroneous. *See In re Involuntary Termination of Parent-Child Relationship of B.R.,* 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (providing that failure to challenge findings resulted in waiver of argument that findings were clearly erroneous), *trans. denied.* We will therefore limit our review to whether these unchallenged findings are sufficient to support the juvenile court's conclusion that the conditions that led to the Child's removal from and continued placement outside Father's care would not be remedied.

[19] Here, Father concedes that he has not participated in particular services or classes aimed at bettering his life and parenting skills, but asserts, "Sometimes the positive steps . . . do not take place until a particular incarceration provides a parent with the opportunity to take those steps[,]" and "Father should be given the opportunity to better himself while incarcerated[.]" *Appellant's Br.* at 6-7. Father attempts to compare his circumstances to the incarcerated father in *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641 (Ind. 2015).

In that case, the Indiana Supreme Court reversed the termination of Father's parental rights, finding that there was insufficient evidence to demonstrate a reasonable probability that the father could not remedy the conditions that led to the child's removal and that the father posed a threat to the child's well-being.[5] *Id.* at 646. Our Supreme Court found that the evidence showed: the father had plans for both housing and employment after his incarceration; while incarcerated, Father completed twelve programs targeted at parenting and life skills and addressing substance abuse; and he continued to have a bonded relationship with his children while he was incarcerated, visiting with them every other week for two to three hours and calling them each night. *Id.* at 647-48. Also, the father in *K.E.* was scheduled to be released from prison in approximately two years after the termination hearing, and the CASA recommended delaying termination, given the father's efforts to complete programs and the bond he had developed with his children. *Id.* at 645.

The facts of the present case are readily distinguishable from *K.E.* Father lived with Child for four months in 2012 and four months in 2013. After Father was released in February 2015, he visited with Child twice, forgot about the third scheduled visit, and then was arrested on felony drug charges and did not exercise, or ask DCS to arrange for him to exercise, any more visits with Child. Father had not participated in programs or services, his only proposed plan

---

[5] We note that in *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641 (Ind. 2015), the father had two children, but only his parental rights to one child, K.E., were at issue.

with regard for care and housing for Child was to return him to Mother when she was out of incarceration, and it is anticipated that Father will be incarcerated for a minimum of twenty years. CASA Gamache and FCM Moore both recommended termination of Father's parental rights.

[22] As Indiana courts have recognized, "Individuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *K.T.K.*, 989 N.E.2d at 1235-36; *C.T. v. Marion Cnty. Dep't of Child Servs.*, 896 N.E.2d 571, 585 (Ind. Ct. App. 2008), *trans. denied.* Furthermore, as we previously stated in another case involving an incarcerated parent, "[e]ven assuming that [father] will eventually develop into a suitable parent, we must ask how much longer [the child] should have to wait to enjoy the permanency that is essential to her development and overall well-being." *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 375 (Ind. Ct. App. 2006) (concluding that trial court did not commit clear error in finding conditions leading to child's removal from father would not be remedied where father, who had been incarcerated throughout CHINS and termination proceedings, was not expected to be released until after termination hearing), *trans. denied.*

[23] Based on the evidence presented, we cannot say that the juvenile court clearly erred in concluding that there is a reasonable probability that the conditions that resulted in Child's removal and continued placement outside the home will not be remedied.

## *Threat to Well-Being*

[24] Father also contends that DCS failed to prove by clear and convincing evidence that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of Child. Initially, we observe that Father has not provided any separate argument or authority for his position, relying only on the previously-discussed argument in which Father compared his situation to that of the father in *In re K.E*. By failing to provide cogent argument, Father has waived his claim. Ind. Appellate Rule 46(A)(8).

[25] Even if he had not waived his argument, we need not address the challenge to the juvenile court's conclusion that the continuation of the parent-child relationship posed a threat to Child's well-being because Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S.*, 987 N.E.2d at 1156. Therefore, as we have already determined that sufficient evidence supported the conclusion that the conditions that resulted in the removal of Child would not be remedied, it is not necessary for us to address any argument as to whether sufficient evidence supported the conclusion that the continuation of the parent-child relationship posed a threat to the well-being of Child.

## Best Interests

Father next argues that insufficient evidence was presented to prove that termination was in the best interests of Child. In determining what is in the best interests of the child, the trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.,* 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*), *trans. dismissed.* In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id.* (citing *In re R.S.,* 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied).* The trial court need not wait until the child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests. *Id.* (citing *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)).

As with Father's general challenge to the juvenile court's "threat to well-being" determination, Father does not advance a separate argument or support for his position that the juvenile court's "best interest" determination was in error. Rather, he advances only the argument that "he should be given the opportunity to better himself while incarcerated" and cites to *In re K.E. Appellant's Br*. at 7. Therefore, Father has waived his challenge to the juvenile

court's conclusion that it was in Child's best interest for Father's parent-child relationship to be terminated. Ind. Appellate Rule 46(A)(8).

[28] Waiver notwithstanding, we find the juvenile court's conclusion was supported by its findings and by the evidence. Father had lived with Child for four months in 2012, the year Child was born, and for four months in 2013. At the time Child was taken out of Mother's care in October 2014, Father was incarcerated and facing felony charges for dealing in methamphetamine, and he remained incarcerated until February 2015, when he posted bond. He was rearrested in April 2015. In the period of February 2015 to April 2015, Father visited with Child twice. He missed his third scheduled visit and never contacted DCS to schedule further visits. At some point thereafter, he pleaded guilty to "doing methamphetamine[.]" *Tr.* at 56. Father did not suggest any particular plan for Child, other than for Child to be with Mother, whose rights were shortly thereafter terminated. CASA Gamache and FCM Moore both testified that it was in Child's best interests for the parent-child relationship to be terminated. Looking at the totality of the evidence, we conclude that sufficient evidence was presented to prove that termination was in Child's best interest.

[29] We will reverse a termination of parental rights only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997). Based on the record before us, we cannot say that the juvenile court's termination of

Father's parental rights to Child was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

[30] Affirmed

[31] May, J., and Crone, J., concur.